### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD FERRIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 03703 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CONVERGENT OUTSOURCING, INC., | ) | |
| TRANSWORLD SYSTEMS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

In February 2016, Convergent Outsourcing, Inc. sent Richard Ferris an initial collection notice about a student loan Ferris had co-signed for a family member. R. 117, Pl. Resp. DSOF ¶ 24; R. 1, Compl. ¶¶ 16-17.[1] Convergent, a debt collection agency, had agreed to attempt to collect on Ferris's loan on behalf of Transworld Services, Inc., which was the loan servicer. Pl. Resp. DSOF ¶ 3. But the notice that Convergent sent incorrectly listed the creditor of Ferris's loan as Chase, even though Chase no longer owned the loan; by 2016 the loan was held instead by the National Collegiate Student Loan Trust (NCSLT). Pl. Resp. DSOF ¶¶ 24, 29. Convergent made the same mistake on 6,011 notices sent to 4,034 consumers (some consumers got more than one notice with the mistake) between January 20, 2016 and March 29, 2016. R. 122-1, Defs. Resp. PSOF ¶ 42.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

In March 2016, Ferris sued both Convergent and Transworld, alleging that Convergent and Transworld had violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (FDCPA), and proposing that the case proceed as a class action. *See* Compl.[2] The previously assigned judged granted, in part, Ferris's motion to certify a class. R. 84. Convergent and Transworld now move for summary judgment on their affirmative defense of *bona fide* error, and also argue that Transworld is not a "debt collector" under the definition of the FDCPA for the purpose of this case. R. 106, Defs. Mot. Summ. J.; R. 106-2, Defs. Summ. J. Br. Ferris has cross-moved for summary judgment on his FDCPA claims against both Transworld and Convergent. R. 114, Pl. Summ. J. Br.

For the reasons discussed below, Convergent and Transworld's motion is granted on the issue of Transworld's status as a debt collector, and Transworld is dismissed from this case. But their motion is denied on the *bona fide* error defense: a jury must decide that issue. Ferris's motion is granted on the issue of whether Convergent violated the two specified provisions of the FDCPA; it is otherwise denied.

## I. Background

In deciding cross motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So when the Court evaluates Convergent and Transworld's summary judgment motion, Ferris gets the

---

[2]The Court has jurisdiction over this claim under 28 U.S.C. § 1331.

benefit of reasonable inferences; conversely, when evaluating Ferris's motion, the Court gives Convergent and Transworld the benefit of the doubt.

Convergent is an agency that collects on delinquent or overdue debts for loan creditors and other servicers. Defs. Resp. PSOF ¶¶ 37-41. Before 2014, Convergent had an agreement with a loan servicing company called NCO. *Id.* ¶¶ 39, 41. The agreement provided that Convergent would "collect monies owed to [NCO] on unpaid and delinquent accounts referred to [it]." *Id.* ¶ 41; R. 113-14, Convergent-NCO Contract at 1.[3] On November 1, 2014, Transworld began servicing loans previously serviced by NCO, and it also took over NCO's contract with Convergent. Defs. Resp. PSOF ¶¶ 39, 41. It "has sent accounts to Convergent for collections since 2014." *Id.* ¶ 40.

When Convergent receives accounts for collection from Transworld, Convergent receives an electronic transfer of information, including information about the loan and contact information for the consumer. Pl. Resp. DSOF ¶¶ 5-6; Defs. Resp. PSOF ¶ 40. The information is uploaded to and stored in a system created by Ontario Systems, Inc., called the "Flexible Automated Collection System" (the parties refer to the system as "FACS," and the Court will too). Pl. Resp. DSOF ¶¶ 4-6.

Convergent retains another company (call it the "letter vendor") to send initial notices and other collection letters to consumers based on the information Convergent

---

[3]The entire contract was filed on the docket under seal, but this specific part of it cannot possibly have a basis for sealing, especially now that it was the basis for judicial decision-making and no exception applies. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546-47 (7th Cir. 2002). So the Opinion does not redact the information.

has entered on each loan in FACS. Pl. Resp. DSOF ¶¶ 17, 22-23. The letter vendor creates notices using templates that electronically fill fields in the letter with information pulled from corresponding fields in FACS. *Id*. ¶ 23. Convergent has processes for creating and testing new letter templates. *Id*. ¶ 18. For example, it appears that changes to templates may have to be "reviewed and approved by management and outside counsel prior to implementation." *Id*. 19; R. 106-1, Hunter Decl. ¶ 19;[4] *see also* Defs. Resp. PSOF ¶ 51. Even viewing the facts in the light most favorable to Convergent, however, there is no evidence that Convergent had a process in place for pre-screening or evaluating changes to the FACS program that might end up affecting the inputs to existing templates. *See* Pl. Resp. DSOF ¶ 13 (citing R. 113-4, Hunter Dep. Tr. at 102:25-103:8) ("When [] new letter templates are sent to the vendor, a sample file is provided so that the finished letter can be checked. This was not done when the programming change was made in this case."); Defs. Resp. PSOF ¶ 51 ("[T]he programming change that caused the specific error in this case did not constitute a change to the letter template. The modification involved a change to the variable data that was auto populated into the letter.") (internal citation omitted).

It is not clear how often either Convergent or Transworld spot-checks the letters produced by the letter vendor. *Compare* Pl. Resp. DSOF ¶ 13 ("Admit that audits are performed. However, the audits do not include review of outgoing collection letters on a regular or reasonable basis."); *with* Defs. Resp. PSOF ¶ 44 ("Convergent

---

[4]Ferris denies Paragraph 19 of the Defendants' Statement of Facts. Pl. Resp. DSOF ¶ 19. But the crux of the denial does not have to do with Convergent's claimed processes for making changes to the template itself.

also performs periodic reviews of high volume and other randomly selected letters previously approved for production."); *see also* Hunter Dep. Tr. at 96:8-21 (explaining that letter *templates* are occasionally spot-checked for errors, but not clearly asserting that letters sent on *individual* accounts are);[5] R. 117-6, Luke Dep. Tr. 37:8-39:22 (asserting that Transworld once conducted a review of 25 of Convergent's letters).

Convergent's FACS program has two fields relating to the creditor of each loan: one field for the loan's current creditor and another for the loan's original creditor. Pl. Resp. DSOF ¶ 5. Convergent's templates pull information from the current-creditor field to fill in the current-creditor information on notices that go out to consumers. *Id*. ¶ 23. On January 19, 2016, a new manager at Convergent, Jareed Peel, requested that the programming team at Convergent make a change in FACS that would result in the consumers' *original* creditor information being listed in that field instead. *Id*. ¶¶ 26-27; Defs. Resp. PSOF ¶ 45. Convergent asserts, and Ferris admits, that Peel requested the change in order to make the original creditor information more accessible to consumer representatives, and thus make it easier for them to answer consumers' questions during phone calls. Pl. Resp. DSOF ¶ 27. But Peel did not know (nor did the programmer who ultimately made the change) that the letter vendor was using that same field to fill in the name of consumers' *current* creditors in its notices. *Id*. ¶ 28;[6] Defs. Resp. PSOF ¶ 45. After the change was made, between January 20,

---

[5]Again, page 96 of this deposition was filed under seal, but there is no basis to do so after the Court has relied on it for judicial decision-making.

[6]Ferris disputes Paragraph 28 of the Defendants' Statement of Facts. Pl. Resp. DSOF ¶ 28. But he does not appear to dispute Convergent's claim that the programmer did not know the field was used by the letter vendor. *Id*.

2016 and March 29, 2016, Convergent sent 6,011 notices to 4,034 consumers that incorrectly listed their original creditor (Chase) in the place of their current creditor (NCSLT). Defs. Resp. PSOF ¶ 42.[7]

In February 2016, Transworld sent Ferris's loan to Convergent for collection. Pl. Resp. DSOF ¶ 3. The loan was in default at the time. *Id*. On February 12, 2016, Convergent sent an initial notice to Ferris that incorrectly listed the current creditor as Chase instead of NCSLT. *Id*. ¶¶ 24-25.

After the suit's filing, Convergent implemented a policy to avoid further unreviewed changes to the current-creditor field. *See* Pl. Resp. DSOF ¶ 19 ("Later, instructions were given to have all changes to the field at issue, field #198.01, approved by senior managers."); Defs. Resp. PSOF ¶ 45; Hunter Dep. Tr. at 98:16-99:4.[8]

---

[7]It appears that part of the issue with Ferris's and rest of the class's loans was that the name of their current creditor, the National Collegiate Student Loan Trust (NCSLT), was too long to include in the field typically used for the name of the current creditor, because that field had a character limit. So Convergent implemented special programming that applied to FACS uploads for the NCSLT accounts only. That special programming put the name of the current creditor in the field typically used for the original creditor, and the name of the original creditor elsewhere. As a result, it was more difficult for telephone representatives to find the name of the original creditor for NCSLT loans than for the other loans they worked on. Peel's requested change was a reaction to that inconsistency, which he apparently was not aware had been configured for a specific reason. *See* R. 113-14, Hunter Dep. Tr. at 70:8-77:25 (these pages were filed under seal, but there is no basis to maintain them under seal). In any case, throughout this opinion the Court will refer to the "original creditor" and "current creditor" FACS fields as they were usually used for *NCSLT* loans, even though they were not used for the same information for other loans Convergent collected.

[8]These two deposition pages were filed under seal, but there is no basis to do so for the specific information cited here, and in the next paragraph.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[9] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

---

[9]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

The Fair Debt Collection Practices Act (FDCPA) "authorizes private lawsuits … designed to deter wayward collection practices." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1720 (2018). Ferris's cross-motion for summary judgment argues that the incorrect creditor information on Ferris's notice constituted a violation of the FDCPA by both Convergent and Transworld. *See generally* Pl. Summ. J. Br. Convergent and Transworld's motion for summary judgment argues that they are not liable for the mistake because it was a *bona fide* error, and also that Transworld is not a "debt collector" subject to the FDCPA at all. *See generally* Defs. Summ. J. Br. The Court will discuss each argument in turn.

### A. Transworld as a "Debt Collector"

First up is the defense argument that Transworld is not a "debt collector" under the FDCPA's definition of the term. *See* Defs. Summ. J. Br. at 11-12 (arguing that Transworld was not "acting as a debt collector as it relates to Plaintiff or the class."). Ferris points out, and the defense acknowledges, that a debt collector may be liable for the unlawful debt collection practices of a company it has contracted to collect its debts—so long as the principal (here, Transworld) on its own qualifies as a debt collector under the FDCPA. *See Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016) ("[W]e think it is fair and consistent with the Act to require a debt collector who is independently obliged to comply with the Act to monitor the actions of those it enlists to collect debts on its behalf. On the other hand, a company that is not a debt collector would not ordinarily be subject to liability under the Act

8

at all."); *see also* Defs. Summ. J. Br. at 12; Pl. Summ. J. Br. at 9-11. But Convergent and Transworld argue that the vicarious liability theory set out in *Janetos* does not apply to Transworld, because Ferris has not presented evidence "that Transworld was engaged in any debt collection activity whatsoever," and Transworld was not involved in any of Convergent's communications with Ferris or the rest of the class. Defs. Summ. J. Br. at 11-12 ("Transworld should not be held liable for the contents of communications sent by another entity. Transworld did not communicate with the plaintiffs or class by telephone, mail, or otherwise and did not prepare, approve or send the letters which are the subject of this lawsuit.").

The defense argument too narrowly confines *Janetos*. Vicarious liability under *Janetos* does not require a debt collector to actively participate in the allegedly unlawful activity at issue in the particular case. All that *Janetos* requires is that the debt collector (1) contracts with another debt collector that *does* violate the Act and (2) is "itself a debt collector" otherwise subject to the FDCPA. *Janetos*, 825 F.3d at 325.[10] Whether Transworld sent letters to or called Ferris or other class members is irrelevant to Ferris's theory of vicarious liability. It is undisputed that Transworld hired Convergent to collect its debts. So the only remaining question is whether Transworld meets the statutory definition of "debt collector."

---

[10]Convergent and Transworld also argue that "the agreement between [Transworld] and Convergent upon which plaintiff relies, establishes that [Transworld] was a servicer, not a debt collector." R. 122, Defs. Reply & Resp. at 8; *see* Convergent-NCO Contract at 1. That argument is not convincing: the language in the agreement about Transworld's contractual role does not bear on whether Transworld meets the *statutory* definition of debt collector.

As Ferris points out, the FDCPA defines "debt collector" broadly. *See* 15 U.S.C. § 1692a(6) ("The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due …"); *see also* Pl. Summ. J. Br. at 2-3. According to the language of the statute, a debt collector may conduct some business other than debt collecting—debt collection must simply be its "principal purpose" or something it does "regularly." 15 U.S.C. § 1692a(6); *see also Skibbe v. U.S. Bank Tr., N.A. for LSF9 Master Participation Tr.*, 309 F. Supp. 3d 569, 574 (N.D. Ill. 2018) (explaining that there are "two prongs to the definition of debt collector under the FDCPA"). Ferris might very well have enough evidence that Transworld does "regularly" collect debt. 15 U.S.C. § 1692a(6).

But the statute also creates a carve-out from the definition of "debt collector," namely, excluded is "any person collecting or attempting to collect any debt owed or due … another *to the extent such activity ... concerns a debt which was not in default at the time it was obtained by such person*." 15 U.S.C. §1692a(6)(F)(iii) (emphasis added). That is, a company is only a debt collector when the debts that it obtains are in default at the time it obtains them. A servicer "obtains" a debt under Section 1692a(6)(F)(iii) when it "acquires the authority to collect the money on behalf of another." *Carter v. AMC, LLC*, 645 F.3d 840, 844 (7th Cir. 2011) (explaining that the

exclusion set forth in Section §1692a(6)(F)(iii) covers servicing agents that do not actually hold the note—even though "one usually 'obtains' a debt by purchasing it.").[11]

On the record evidence presented, no reasonable juror could find that any of the debts at issue were in default when Transworld received the rights to collect them. Ferris, as the plaintiff who bears the burden of proof on this issue, has not come forward with any evidence to show either that Ferris's loan was in default at the time it was transferred to Transworld, or even that Transworld only or primarily services delinquent loans. Ferris points to evidence that the contract between Transworld and Convergent only covers "delinquent accounts." R. 116, Pl. Resp. Defs. Mot. Summ. J. at 10 (*citing* R. 113-14, Convergent-NCO Contract at 1,[12] which was later assigned to Transworld and retains Convergent "to collect monies owed to Client on unpaid and delinquent accounts referred to" it). But the fact that *Convergent* only worked on delinquent loans says nothing about whether the loans were in default when *Transworld* obtained them. Similarly, the parties agree that Ferris's loan was unpaid on February 9, 2016, the date on which Transworld sent it to Convergent for collection. *See* Pl. Resp. DSOF ¶ 3. But there is no evidence of when *Transworld* acquired rights to service the loan, or whether it was in default at that point.

---

[11]A company that purchases a loan while it is in default, and thus "obtains" it in the usual sense (as opposed to just receiving rights to collect on it) likely would not qualify as a debt collector anyway for the purposes of the exclusion. *See Henson*, 137 S. Ct. at 1721-24 (holding that a debt purchaser is not a debt collector under at least one of the prongs in 15 U.S.C. §1692a(6)).

[12]Again, the parties filed the entire contract under seal, but there is no basis to seal this specific piece of information.

Ferris points to two other pieces of evidence that he believes show Transworld is a debt collector under the statute, but neither helps him. First, Ferris highlights language on Transworld's website that trumpets Transworld as a "debt collection" trailblazer. Defs. Resp. PSOF ¶ 38; *see also* R. 117-16, Transworld Website Excerpts. But no reasonable jury would conclude that the advertising language on Transworld's website necessarily makes it a "debt collector" under the *statutory* definition, or that the website proves Transworld only or even primarily services delinquent debt. Second, Ferris notes that Transworld holds debt-collection licenses in several states. Defs. Resp. PSOF ¶ 38; *see also* R. 117-14, Transworld Collections Agency Licenses. But Transworld's licenses—even if they suggest it does at least some debt collection—again do nothing to establish that any of the loans it services were in default at the time it received them.

The bottom line is that no reasonable jury could conclude that Transworld is a debt collector under the FDCPA's definition. As a result, Transworld must be dismissed from the case. Going forward in this Opinion, the Court will evaluate Ferris's claims against Convergent only and will refer to the Defendants' possible defenses and arguments as Convergent's.

### B. FDCPA Violation for Incorrect Creditor

The Court now moves to Ferris's cross-motion for summary judgment. Ferris alleges two violations of the FDCPA. First, he argues that Convergent violated 15 U.S.C. § 1692g(a), which sets out requirements for the initial notices that debt collectors must send to consumers, including that the notices must include "the name

of the creditor to whom the debt is owed." 15 U.S.C. § 1692g(a)(2). Second, he argues that Convergent violated 15 U.S.C. § 1692e, which prohibits "false, deceptive, or misleading representation[s]" about "the character, amount, or legal status of any debt" in debt collectors' communications with consumers. 15 U.S.C. § 1692e(2)(A).

Section 1692g(a) is easy. Convergent does not dispute that the notice Ferris received was an initial notice. Pl. Resp. DSOF ¶ 24. That means it is covered by the sub-section. Convergent also does not dispute that Ferris's notice incorrectly identified his creditor, Pl. Resp. DSOF ¶ 29, a clear violation of 15 U.S.C. § 1692g(a)(2). So at least with respect to Ferris's notice (and any other initial notices received by class members) Convergent violated 15 U.S.C. § 1692g(a).

Section 1692e is not much harder. The facts are clear: Convergent sent 6,011 notices to 4,034 consumers, all of which incorrectly listed a previous creditor instead of NCSLT as the creditor. Defs. Resp. PSOF ¶ 42. The only possible complication is that unlike § 1692g, § 1692e also includes a materiality requirement. That is, a debt collector is not liable under the section unless its misrepresentation would "mislead the unsophisticated consumer." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009); *see also Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 349 (7th Cir. 2018) ("Generally, § 1692e only protects against false statements that are material—in other words, statements that would influence a consumer's decision to pay a debt.") (cleaned up).

The materiality requirement is met here, and no reasonable jury could find otherwise. Telling a consumer the wrong creditor's name would readily impact the

consumer's response to the notice. For example, if Ferris had wanted to contact the creditor to be sure that Convergent was authorized to collect on its behalf, then he would not have been able to do so here. *See Janetos*, 825 F.3d at 324-25 (discussing this possibility). Or Ferris could simply have been confused about what debt Convergent was purporting to collect, and he might have delayed paying the bill to figure it out (or just not paid at all), leading to late fees or other expenses. *See* R. 84, Class Cert. Order at 7-8 (describing this scenario). Convergent's mistake would almost certainly "mislead the unsophisticated consumer," and might very well influence whether that consumer would pay the debt or not. No reasonable jury could find that Convergent did not violate §§ 1692e and 1692g.

### C. *Bona Fide* Error

Next is Convergent's argument that the violations of the FDCPA were the result of a *bona fide* error. *See* Defs. Summ. J. Br. at 5-10. The statute sets forth an affirmative defense for debt collectors who have otherwise violated the FDCPA: a debt collector is not liable if it "shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The defense requires three elements: "(1) … that the presumed FDCPA violation was not intentional; (2) … that the presumed FDCPA violation resulted from a bona fide error …; and (3) … that [the defendant] maintained procedures reasonably adapted to avoid any such error." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005). The Court moves on to each element.

14

### 1. Unintentional and *Bona Fide*

The first two elements of the *bona fide* error defense require that the violation be unintentional and that it be *bona fide*—that is, "an error made in good faith; a genuine mistake." *Kort*, 394 F.3d at 538. There is no genuine dispute about either element in this case. As to intent, Ferris has admitted that "the creditor name was inadvertently populated" with the incorrect information and that the mistake was unintentional. Pl. Resp. DSOF ¶¶ 29, 35. On whether it was *bona fide*, the error was a genuine mistake: Peel requested that the developers change the information contained in the current creditor field because he believed the change would make Convergent's telephone operations easier—not because he hoped it would confuse the debtors. *Id.* ¶¶ 26-27. There is no evidence that either Peel or the software developers knew that the change would result in the letter vendor using an incorrect creditor name. *See id.* ¶¶ 12, 28. It appears that the possibility simply did not occur to them. On this evidence, a reasonable jury could not find that the error was intentional, or that it was not *bona fide*.

### 2. Preventive Procedures

To succeed on the *bona fide* error defense, Convergent also must prove by a preponderance of evidence that the error occurred "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Procedures that qualify as reasonably adapted to avoid mistakes like Convergent's must be institutionalized and systematic; the Seventh Circuit has stressed that "procedures are 'processes that have mechanical or other such regular orderly steps.'"

*Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 990 (7th Cir. 2015) (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010)). On the other hand, the procedures need not be perfect: "[Section] 1692k(d) does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires *reasonable* precaution." *Kort*, 394 F.3d at 539 (emphasis added); *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004). Here, a reasonable jury could find for either Ferris or Convergent on this issue.

There are at least two different types of procedures that might have helped Convergent avoid the error it made in this case, and Ferris relies on both in trying to defeat the defense. First, Convergent could have improved its review process for making programming changes to the FACS system. Under this sort of "programming procedure," Convergent could have required that proposed changes to the FACS programming be reviewed by managers with a better understanding of how the letter vendor used the FACS system. Or Convergent could have required simple testing of the effects of any programming changes on all templates immediately after—or even before—the changes were made. *See* Pl. Resp. DSOF ¶ 13. Convergent has since implemented this sort of fix. *See id.* ¶ 19 ("Later, instructions were given to have all changes to the field at issue, field #198.01, approved by senior managers."); Defs. Resp. PSOF ¶ 45 ("Defendants admit that Convergent has implemented an additional layer of approval, above and beyond the development team approval process that was already in place at the time the error occurred, for modifications to the field in question."); Hunter Dep. Tr. at 98:16-99:4. So if Convergent disputes the feasibility

of that change, Ferris could introduce that evidence too under Federal Rule of Evidence 407.

Second, Convergent could have conducted spot checks on its letters to catch errors like this one. *See* Pl. Resp. DSOF ¶ 13. Either this spot-check procedure or the programming procedure discussed above could have prevented the FDCPA violations at issue here. *See id.* ¶ 30 ("If a well trained person had read the letter it would not have been sent."); *id.* ¶ 45 (explaining the new process for requesting changes to the field in question); Defs. Resp. PSOF ¶ 44 (admitting that "[r]eading the letter and comparing it to the account information would have revealed the problem."); Hunter Dep. Tr. at 98:16-99:4 (explaining that Convergent's recent policy fix would prevent this error from happening again).

The jury could go either way on whether a programming procedure or spot-checking procedure was reasonably required to prevail on the defense. On the programming procedure, Convergent had already implemented methods for testing letter templates when they *first* went into use. Pl. Resp. DSOF ¶¶ 18-19. What it failed to do was develop procedures to check the effects of programming changes on already-existing templates—or otherwise prevent changes from taking place that might affect already-existing templates before understanding the impact on the letters. *See id.* ¶ 13 ("When [] new letter templates are sent to the vendor, a sample file is provided so that the finished letter can be checked. This was not done with the programming change was made in this case.") (internal citation omitted); Defs. Resp. PSOF ¶ 51 ("[T]he programming change that caused the specific error in this case did

17

not constitute a change to the letter template. The modification involved a change to the variable data that was auto populated into the letter.") (internal citation omitted). Viewing the facts in the light most favorable to Ferris, Convergent should have implemented tight controls over changes to FACS fields, because those fields were used by the letter vendor to communicate directly with debtors.

In contrast, however, a reasonable jury could conclude that it would be unreasonable to require Convergent to have that sort of programming procedure in place. The FDCPA does not require *perfect* foresight, *see Kort*, 394 F.3d at 539, and viewing the facts in the light most favorable to Convergent, there is no evidence in the record that suggests it has made a similar error before. For all the record shows, no employee had previously skipped discussing a programming change with senior management before instructing the development team to make a change—so it might not have occurred to Convergent that it had to protect itself from that possibility. (Ferris seems to believe that Peel acted as sort of a rogue employee when he requested the change, which could actually be viewed in Convergent's favor. *See* Pl. Resp. DSOF ¶ 12 ("Peel was not authorized to make the change but did it anyway."); *but see* Defs. Resp. PSOF ¶ 45("Managers such as Peel are authorized to request such changes from the development team.").) Reasonableness is a quintessential jury question, and the jury could go either way.

As for spot-checking, it is unclear whether Convergent had fixed and regular procedures for spot-checking, or how often spot-checking usually occurred. *Compare* Pl. Resp. DSOF ¶ 13 ("Admit that audits are performed. However, the audits do not

include review of outgoing collection letters on a regular or reasonable basis."); *with* Defs. Resp. PSOF ¶ 44 ("Convergent also performs periodic review of high volume and other randomly selected letters previously approved for production."). In his deposition, Jeffrey Hunter, Convergent's representative, testified that already-existing templates might be reviewed again at some point after entering circulation. Hunter Dep. Tr. at 96:8-21. But his testimony does not necessarily say that specific consumer letters are spot-checked; it could be read to suggest only that some letter *templates* get a second review. *Id*. at 96:18-21 ("[Lisa Burton]'s going through and looking through letters that have a high volume of send and other things to randomly pick accounts or letter templates.").

Bradley Luke, a representative from Transworld, spoke more specifically to spot checks. Transworld conducts occasional audits of Convergent, some on site and some virtual. Luke Dep. Tr. 37:19-39:22. It appears that during at least one audit, Transworld conducted a "review of 25 randomly selected [collection] letters" sent by Convergent on Transworld's accounts. *Id*. at 37:8-12. But it is not clear whether that is a regular practice, much less a required one. It is also not clear whether Transworld conducts these audits on a set timeline. Luke testified that before the errors in this case took place, Transworld conducted an audit of Convergent in September 2015. *Id*. at 37:19-38:1. The next audit Transworld conducted of Convergent was apparently in August 2016. *Id*. at 38:24-39:1. At the time of Luke's deposition, he was not sure when the next audit of Convergent was scheduled. *Id*. at 39:21-22. Viewing the evidence in the light most favorable to Convergent, the September 2015 and August 2016 audit

dates allow a reasonable inference that Transworld conducts audits around once per year. But the evidence certainly does not *require* that conclusion. In fact, viewing it in the light most favorable to Ferris, a jury could conclude that the August 2016 audit was performed because of this litigation (which was filed in March 2016)—not as part of a set audit procedure that stretched back into the past. And, in any event, even viewed in the light most favorable to Convergent, there is no evidence that Transworld reviewed more than 25 randomly selected letters during each audit—or even that it conducted spot checks every time.

Plus, even if audits *were* performed once each year, and always involved reviewing 25 randomly selected letters, a jury could still conclude that those procedures were not *reasonably* adapted to prevent the sort of error that occurred here. Viewing the evidence in the light most favorable to Ferris, a jury could decide that the high volume of letters that Convergent sends (at least 6,011 in less than a three-month period in 2016) suggests that it should spot check letters much more frequently than once per year. It will be up to a jury to weigh the evidence: both on whether there *was* a spot-checking procedure in the first place, and then on whether it was reasonably adapted to avoid this kind of error.

As a result, although there are very few disputes about the actual facts here, a reasonable jury could find either for Ferris or Convergent on the issue of whether Convergent's procedures were reasonably adapted to prevent mistakes like this one. The question is one of reasonableness, and courts have acknowledged in other contexts that reasonableness is a classic jury question. *See Sarver v. Experian Info.*

*Sols.* 390 F.3d 969, 971 (7th Cir. 2004) ("[Under the Fair Credit Reporting Act,] [t]he reasonableness of a reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness is beyond question."); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) ("[In the context of trade secrets,] we have previously recognized that only in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case.") (cleaned up). So too here.

## IV. Conclusion

For the reasons explained above, Convergent and Transworld's motion for summary judgment, R. 106, is granted in part (Transworld is dismissed from the case) and otherwise denied. Ferris's cross-motion, R. 114, is granted on the issue of the FDCPA violation, because a reasonable jury must find that Convergent violated the two provisions of the FDCPA. But there remains a question of material fact on Convergent's *bona fide* error defense: whether Convergent's error took place despite procedures reasonably adapted to prevent it.

Before the next status hearing, the parties must engage in settlement negotiations, now that the summary judgment motions have been decided. At the next status hearing, the parties must be ready to discuss the next step of the

litigation, whether it be a trial schedule (which presumably would apply to the entire certified class) or a formal settlement conference (if needed).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 28, 2019